We'll hear argument next in No. 21-708, United States v. Sandalo. We'll wait for counsel to come up to the counsel table. Thank you. Thank you. Okay, Mr. Grissenden. Good morning. Matthew Grissenden for Mr. Sandalo. The accountant in this case was entitled to a frank statement. He was entitled to a frank statement because he made a substantial preliminary showing of not one but two material misstatements and facts in the warrant application. No. 1, that there had been this 2019 controlled call with the CI during which a shipment of narcotics was discussed. And No. 2, that the CI had been present inside the accountant's home on the night of June 5th, the night before the warrant issued, and had an opportunity to see narcotics therein. He made that showing not by conclusion of statements but by three separate sworn affidavits. Now, the people have argued that even if there was a preliminary showing of misstatements, we haven't met a burden in demonstrating the source of that misinformation. In other words, people have argued that perhaps the affidavits in the application of Police Officer Conway was acting in good faith and relying upon what he learned from the CI. But we know that's not true, at least with respect to the first misrepresentation, right? Because apparently the only person in the universe who's aware of this 2019 controlled call is Officer Conway himself. We know from the record that if the CI was called as a witness, he would state he has no recollection of those controlled calls or controlled texts. And troublingly, we know there's not a shred of documentary evidence. There are no texts. There's no phone records. Does that make the officer untruthful? What it means, Your Honor, is that we've met a burden. Well, it means that there might be better evidence to establish, there might be a better way to prove it. But does it show that the officer was untruthful? It doesn't show that he was untruthful. It shows that there might be a better way to verify what happened. But it doesn't show that he was untruthful. How? How? Because the officer said something different on another occasion? No, answer my question. Did you show that the officer said something different on another occasion? The answer is no. Did you indicate that the officer previously made a record that was inconsistent with his statement? The officer's made no record whatsoever of his controlled call. Okay, so that may go to credibility, but doesn't necessarily show that he made a misrepresentation. What we have, Your Honor, is we have a sworn affidavit from a client stating his controlled call never happened. Well, of course. Of course. I mean, there are people who say things didn't happen, but that doesn't make it so. And it's equally, it stands on one side, but it doesn't show that he's being untruthful, does it? We also have, Your Honor, a statement of the C.I.E. himself who will say that, as far as he's concerned, he has no recollection of this type of controlled call ever happening, Your Honor. So it's not just this one statement of my client. It was also the C.I.E. himself who doesn't recall this happening. The C.I.E. made this statement that Sandler is currently in possession of a large amount of powder cocaine, hundreds of oxycodone pills, and multiple pounds of marijuana. Why wouldn't that be enough for probable cause anyway? So in determining, in Frank's analysis, we need to look at what was in the application itself. I think, Your Honor, you're referring to the R.O.I., the interview of the C.I.E., which took place after the fact. And during that interview, the C.I.E. is proffering to the United States Attorney's Office, and of course we don't have a chance to cross-examine him, but he's apparently proffering additional facts about things that he knew and was aware of. They don't necessarily make their way into that affidavit. Well, that was in the affidavit, right? The C.I.E. made that statement to the affiant, and it was in the affidavit. Well, he made two statements, right? He made a statement that there was this controlled call, and there was a statement that on the night prior to the search, he was at the house, was inside the house. But according to the affiant, this is what he was told, the C.I.E. said he went into the house and saw the large presence of narcotics there. The R.O.I. that we see is suspiciously missing that information. Why is it plausible that he went inside the house? I mean, it seems to be indisputed that he was there, at least outside the house, for some extended period of time, and why would anyone notice if he went in to get a beer or to use the toilet or anything else? And why shouldn't, at least why shouldn't the police assume that when he says, I saw this stuff in the house, that he went inside the house? Several things. First, so the record was that he was at the house for approximately an hour on June 5th. We have two separate witnesses who provide sworn statements saying that during that time period, he socialized in the driveway area and that he did not set foot in the house. So again, the burden here is not the burden that we would get after a Frank's hearing. To demonstrate the scientific ponderance of the evidence, we need to make a substantial preliminary show that he did not open the door to be entitled to that information. Could you expand on what is your burden now? Does the government have a presumption? Does the government enjoy any presumptions here? I would argue that this Court should be approaching this on a debatable basis. In front of the District Court, our burden was merely to make an assertion that's beyond a conclusory assertion, to make a substantial preliminary showing that's supported by sworn evidence, which is exactly what he did. As far as the rest of these questions, now, can I prove exactly what the CI said to Mark Atkins on the night of June 5th after he left the driveway? No, I'm not privy. You're right, I'm not privy to that conversation. But I would say, except that those facts remain obscure, that's only because the government has chosen to keep them obscure. After we put in our evidence and made a substantial preliminary showing, the government couldn't put in an affidavit from the CI saying, no, this is what I told the agent, and of course, they didn't do that. So there's nothing in the record to say that the informant told the police that he entered the house? There is nothing in the record that establishes the CI told the informant that he went into the house. That's right. Other than the face-up of the affidavit itself. The information that has come out since then has been notably absent. My question is, why can't the police assume that if the informant said, I went to the house and I spent some time there, and there's drugs in the refrigerator, why can't the police assume that at some point and for some interval, however brief, he entered the house? There are a lot of reasons you might enter a house, you sort of get a beer. I think Your Honor's question presupposes that the CI did, in fact, make that statement to the police officer. And it's our position that, in fact, the statement was never made. Didn't the CI say that there were drugs in the house and they were located here and there in the other place? In his interviews with the government, he never tells the government in the ROIs, which is striking. The government never asks him, were you in the house? I mean, this was an issue. If you look at the ROIs, the government never asks the person the question, did you, in fact, go into the house the night of June 5th? Instead, we have this general information that's provided in these ROIs. Look, if I told you that I went to somebody's house and I have a really nice television set, wouldn't you assume that I went inside? Well, again, the question is, what exactly did the CI say to the officer? The only way to find that out, right? The question is, if he simply said— But it's a CI that had provided reliable and accurate information in the past, right? There's that finding. There are general allegations that he provided. Without any details that he had provided. So if he, in fact, said that Sandal is currently in possession of all of those drugs, that would be probable cause, right? Your argument hinges on the idea that maybe he didn't say that. My argument is that the question is whether he said specifically, I went into the house and I saw those narcotics. Now, if what he said instead to the officer was, I was socializing with my cousin. I left. I hear he has a bunch of drugs in the house. That's a very different scenario than what was presented to the issuing judge in the application. Because what the issuing judge saw was that he was in the house and that he saw these narcotics with his own eyes. And, you know, again, unless we have a hearing, I guess we'll never know for sure. But I strongly suspect that if called as a witness, what you would hear from the CI is exactly what we have in this sworn affidavits from the people who were at the party. That is, I was at the party. I stayed outside. I socialized. I left. I happened to be called on my way out by the police officer as I left. Again, the verdict here is not by a prominence of the evidence. It's only a substantial— He happened to be called by the police just as he was leaving. He happened to be called. The information is not that the CI left the house and said, Oh, my Lord, I've seen such incriminating evidence. I'm going to get on the phone right away and call my officer. The testimony was the officer happened to call him as he was leaving. Can I ask you about the warrant? So you understand that you say the warrant doesn't specify a crime, but it asks for all of these items that are drug-related. Is that not sufficient to specify the crime? So it does specify that the police are authorized to seize narcotics and related materials, but it doesn't specifically cabinet the search in terms of any particular offense. And I think when it becomes particularly problematic is when you get into the latter parts of the warrant that allow for the seizure of phone records, of computers, of items of that sort without cabinetting that in temporal terms or without cabinetting that in terms of a specific offense. And it's your argument that the affidavit and the application were not attached to the warrant or just that we don't know? Looking back at the record, it appears that there's simply no assertion one way or another as to whether it was in fact attached as far as I can tell. What I would say is that the government was uniquely in a position to clarify that fact. If you look at the warrant application, there's a statement on there that says that the defendant is not entitled to see the application itself. So who didn't know that when the officers came in that they had access to the underlying application? So when we say attached, what is the relevant attachment? Does it matter if the officers saw it? I thought the whole point of attachment is for the subject of the search to see it. No, I think the relevance of attachment is was there sufficient guidance being provided to the officers who are executing the search themselves to keep it within the constitutional framework? Oh, so that's interesting. So your position is even if Sandilow didn't see the affidavit, it would be sufficiently attached as long as the officers had seen it? If they had, again, there's a number of officers who are going into the house. It's not, I think, one of the more affidavits in the house, but there were multiple other officers executing this warrant. So the question is, are they being provided with the necessary guidance to know what is off-limits and what's on-limits? That's going to be next. OK. Mr. Brissenden, so you've reserved time for rebuttal, so we'll hear from you again. Let's turn to the appellee, Mr. Silverman. Good morning. May it please the Court, my name is Mark Silverman and I represent the United States on this occasion. As he did in district court proceedings, Mr. Sandilow raises a number of challenges to the validity of a state search warrant in this case. I'll start with the Franks challenge. As some of the questioning picked up on, there was a failure to make a substantial preliminary showing acquired by the United States Supreme Court in this case that would have warranted an evidentiary verdict. With respect to the controlled phone contact between the suspected informant and the defendant himself, Mr. Sandilow, the district court properly found that even if that information had been excised from the affidavit entirely, probable cause still would have existed in this particular warrant. Because of the visit to the home? Yes, Your Honor. So turning to the visit to the home in June 2019, the district court's conclusion was that that information was material, but that nothing in the affidavit submitted by Mr. Sandilow, his wife, or his father bore at all on the appearance of state of mind. That is, Officer Sudow and Officer Connolly were the applicants in the state search warrant application. In that context, there's no information suggesting that they recklessly disregarded the falsity of any state of mind. But if the three of them are correct, and they're all self-interested, but the three of them, if they're correct, then the confidential informant never entered the house. And if that is so, then there's reason to think that the confidential informant didn't tell the police that he entered the home. And indeed, there's nothing to indicate that he did tell them that he actually entered the home. And since the confidential informant located the drugs in various places where they were not, why isn't there a basis for assuming that the confidential informant never told the police that he entered the house, and maybe they didn't want to ask him? Well, I appreciate the court's question, and I guess I'll say one thing in response. It's on the question Judge Jacobs asked my adversary, which is, was there any sort of presumption here that applies? There is. Frank C. Delaware makes quite clear that a presumption of validity applies to a warrant. Right? That's why we require substantial evidence. Well, I mean, if the judge issues it, there's a presumption of validity. But if the judge is not given the information that allows the judge to make an honest call on it, then there is no presumption. Well, I guess one manner in which I can push back on Your Honor's question here is that it's not enough under Frank's to show, to make a substantial preliminary showing that there's falsehood contained in the affidavit. Frank's requires this additional showing that the affidavits knew of that falsehood, or recklessly disregarded it. And there's nothing in the affidavits submitted by Mr. Sondalo, his wife, or his father, which suggests that the affidavits, Officer Suda and Officer Connelly, should have known that this person never went inside the house. Right? They have information from him. They know he's got mobility issues. But as the district court points out, there's nothing here that defies physical reality. Well, the police say he walked up the steps in the police station, so. Correct. And the district court has this nice example that I think illustrates the point. If the informant had no wheelchair around, but the house was wheelchair inaccessible, then the officers wouldn't have reason to believe he had been in the house. Another example, and I know I'm being somewhat fanciful here, but if the informant had said to the police, hey, the house is red and white stripes and polka dots, and the police had driven by and seen that the house was blue, then we have reason to question the information that the informant is giving to them. But there's nothing like that in this case. And I guess one other point I'd like to make in pushing back on this argument here is that the defense undertook its own investigation, identified for themselves who they believed the informant to be. In another scenario, one way that the defendant, Mr. Sandala, could have satisfied the verdict was to ask that informant for an affidavit, saying, I never told the police these things. Now, maybe in this scenario, that wasn't going to happen. Maybe the informant would have refused to provide such an affidavit. But there are ways for a defendant in this particular situation to meet the France standard, that substantial preliminary show. Well, it's a lot to ask that they should go to the informant and ask the informant to do an affidavit that impugns the police, especially since most of the time an informant has reasons to be very dependent on the police. And you're almost right. I'm suggesting one way that the verdict could be satisfied. But there are these other ways. And this is to suggest something that obviously defies physical reality. This is the wheelchair example. Or some other objective fact that the police should have known just by driving by the house. Here, we have a situation where the informant provided information that the police couldn't corroborate. Now, they weren't able to go inside the house before applying for the warrant to see where the drugs are. But they did demonstrate. They showed pictures of Mr. Sandalo. They did records checks about his car, about his address, his known address. And all of it matched the information that the informant had provided. So against the backdrop in which this informant had provided credible and reliable information used in other investigations, as noted in this affidavit, the affidavits were entitled to reliable information provided to them. It appears that the judge made some errors. I mean, at least one she rethought and withdrew. But she also said that the affidavits  the house without Sandalo's knowledge or that of his wife or that of his father during periods when they were not home. But they all were home when he was there for that hour. And he called when a phone call was made from the police immediately afterwards. So we're only really talking about an hour and a half. We're not talking about 24 hours. Yes, sir. That's true. I suppose the district court was talking about the possibility that maybe the informant returned the next day. But that wouldn't line up with the house. He reported it that night. Yes, sir. Yes, sir. I was going to move on to something else. But do you want to wrap up this? So I want to ask about the warrant. So that provision of the warrant where the judge dispensed with the requirement that the application and affidavit be shown to the subject of the search, doesn't that mean that when it was presented to the subject of the search that the affidavit wasn't attached? Your Honor, I do believe the affidavit was not attached when it was presented to the subject of the search. And isn't the point of attachment to provide notice to the subject of the search? I do think that that is one point of attachment for purposes of notice. But I think the attachment issue that my adversary was getting at in the dialogue with you earlier had to do with guiding the discretion of the officers executing the warrant. And here, I agree, the record does not speak to whether when the officers were there on the day of the execution on June 6, they had the warrant attached to the application, attached to the affidavit, and so on. But what the record is quite clear about is that one of the applicants, Officer Suda, was the lead case agent for the execution of the search warrant. The record is also clear that the team did not search the in-law apartment on June 6, 2019. And there's no complaint made that they seized any evidence outside of evidence related to the drug trafficking activity. And what does that point mean? I mean, can you fix a defective warrant by not searching, by not taking full advantage of it? Or you're saying that shows that they must have seen the affidavit? Is that the point? Well, I think what it gets to is what the point this Court has made in Rosa, and then more recently in Purcell, which is that even if there's a defect on the base of a warrant, it can be saved by good faith. And this is the sort of good faith situation where there's no evidence. All right. So then it doesn't even matter whether they searched the in-law apartment or not. What matters is whether they were relying in good faith on a warrant where they had followed all the proper procedures. Well, here it's quite clear that in the affidavit, the officers, the applicants, including Officer Suda, had intended to exclude that in-law apartment. Right. It's set forth in that paragraph in the affidavit. And so I think that the implication of all of this is to say that just like in Rosa and just like in Purcell, the officers were acting in compliance with the parameters they believed to have been authorized by the state court judge of the United States Superior Court when executing the warrant. So even if that exclusion of the in-law apartment hadn't made its way from the affidavit into the face of the warrant, the officers acted like they had. That may not cure a defect in the face of a warrant. But it would show good faith, you're saying. Yes. Exactly. And what about, and so I take it, so the Connecticut state law allows for this procedure where the affidavit is not shown to the subject of the search. Yes, I think it's specific. Is that sufficient for us? I mean, since we have said that the point of attachment or maybe a point of attachment is noticed to the subject of the search, can we still consider it attached even if it wasn't shown to the subject of the search? Well, I'm not sure. I mean, I guess you might agree with opposing counsel who said actually the important point is that it was shown to the officers and it constrained their activity. I do believe that's an important point to the Fourth Amendment analysis that underlies the suppression challenge of these cases. I don't think it has to do with whether the defendant in the end had notice. Indeed, I'll stop it there. I think the broader point here is that the district court was careful, thoughtful. It issued a lengthy ruling denying the motion to suppress. It considered whether the affidavit submitted by Mr. Zamballo, his wife, and his father not just alleged falsehoods or false information in the affidavit, but the state of mind of Officer Souda and Officer Khan. It also went through the challenges separate and apart from the Franks issue related to overbreath, insufficient particularity, and probable cause for the warrants. Does it matter that the informant identified like four places where drugs would be found? And of those four places, the only one where it was found was in the freezer? I don't want to say everybody keeps drugs in their freezer, but everybody who has drugs keeps them in the freezer. But the drugs are really found elsewhere. So, Your Honor, I think we're going to drill down on the record on this point. We ought to be careful. So we know that some of the drugs ended up being located in a glass vase in the dining room. And not in a crawl space or in a boiler room. But the way I read, and I'm going to go to the record itself right now because I want to make sure I get this right, Your Honor. If I look at CA, this is the confidential appendix that was submitted in the early 80s. CA 83, paragraph 11 of the DEA report of the suspected informant that was provided prior to the suppression of the hearing held by the district court. The CA stated that Zabala would keep marijuana-baked cartridges in the refrigerator. He would keep pills in the boiler room, cocaine in a partially finished area basement in a crawl space where the marijuana would be hidden. Now, I'm not sure that this is specific to when the CI went around the house on June 5th. This is where he saw them, so much as, in my experience of dealing with Mr. Zabala, and if you look at paragraph 9 on the preceding page, CA 82, the CI informed the person who wrote this report, Zabala showed him narcotics at the residence approximately 15 to 20 times. So this may depend on other instances. These are some of the hiding places he uses. But if you look at the report of the interview conducted with Officer Connolly, CA 78, paragraph 4, Officer Connolly reported that the CI had informed him that drugs were located on the first floor. He should check the refrigerator, the trunk of the car in the garage, and the vase in the dining room. Sure enough, those are locations in which drugs were located. So it's not entirely clear to me that there is any sort of inconsistency or discrepancy the way the questions may have suggested, the way Mr. Zabala may have suggested in the briefing. If there are no further questions, the government of Bresson is briefed and respectfully submits that this court should affirm the suppression ruling entered by the district court and the judgment entered by the district court. Thank you. Thank you, Mr. Silverman. And we'll hear back from Mr. Brissenden on rebuttal. Thank you. Just to approach Frank's issue one more time. If we accept that the affidavit submitted by the defendant has created a substantial preliminary showing that the informant was not, in fact, in the house on the night of June 5, that allows for two possibilities. Either the informant misstated what happened to the affidavit, or the affidavit misstated what he was told by the CI. Even if we assume we know nothing else about the situation, that allows for a 50% possibility. Or the police, in good faith, drew an inference from what the CI said, which was accurate, but the inference was not accurate. Even if we assume that what happened was the officer inferred or misunderstood what the CI, in fact, told him, we still have a situation where the affidavit is putting something in his application that's not true. And then the question becomes, is that recklessness, right? And that's an appropriate inquiry for our defense. And they say that sunlight's the best disinfectant. And I think that's exactly the description that's called for. But why is it not true? You're saying that it might be that the CI made a misstatement, but the fact that he said it to the affidavit would not be not true? I'm saying it's too possible that it's true. There's a 50% chance that he put in something that's not true, you're saying. I mean, assuming that these all have equal probabilities. But yeah, I get it. We assume nothing, right? As far as whether or not we met our burden here, the substantial preliminary showing, right? We assume we got to the threshold of 50%, 49%. That meets that burden, I would submit. Because the burden at a price point itself is a preponderance of evidence. It's over 50%. If we can show by over 50% chance that this misstatement originated with the affidavit itself, then we should win a Frank's hearing. Forget about getting a Frank's hearing. So again, the government is sort of front-loading Vernon at a Frank's hearing at this preliminary stage. And all we're asking for is not going  Of course, the only people that know are the government. There was a suggestion that we should have gotten an affidavit from the FN. The government, or the CI rather, the government set out the CI when the council, we couldn't speak with the CI. And so that's not a realistic possibility here. The last point I'd make is the government dismisses this 2000 I'm sorry, you couldn't speak with the CI because the CI had counsel? We did counsel. We reached out to counsel. We served a subpoena on counsel. We've not had an opportunity to interview the CI. Would the district court be within its discretion not to permit the CI to testify because of danger to the CI or because that person's identity is a valuable tool in other cases? I just see no authority. The government is setting no authority. That would allow the government to foreclose a constitutional right to call a witness at a hearing based on a morphous concept that this is the government's witness. This is the government's CI. Especially in this case where there's no showing at all that there's a specific or credible danger to the CI. So no, I'm not aware of any authority that foreclosed the government from our opportunity to call a witness on our own. It's different than asking for the government to specifically identify. In terms of your burden now, you're saying that it's less than a preponderance. I'm saying the burden. That's right. I was just asking. We are a general overview, right? Looking at it and what our burden should have been to get our friends. And yes, it's less than a preponderance. It's what the Supreme Court says it has to be more than a conclusion ratio. We've certainly met that burden here. The last point I guess I would make, unless there are any other questions, regards the January 2019 phone call, the control call which the government dismisses as being immaterial and as not mattering. But your only argument on that is that there's no paper on that. Well, there's more to that. It's also that the CI itself apparently called as a witness and said, I don't recall any text messages or control calls along those lines, right? How many control calls? It's multiple text messages. Is it more than one? We don't know that because, of course, when the government brought in Officer Conley to ask him about it, he couldn't remember anything about the details of these supposed text messages. From the warrant application, it suggests that there were both text messages and phone calls, none of which have ever been produced. And as far as the good faith of the advocate goes, again, we know this isn't misinformation coming from the CI in this example, right? If somehow this event was actually fabricated, that fabrication would have necessarily come from Officer Conley. And would the fact that the CIA doesn't remember it now doesn't mean that the CIA didn't remember it in the past. It's not conclusive. But what I would say is the evidence that we have, the affidavit of my client, the complete absence of any records, how are there no phone records? How are there no text records? And the fact that the affidavit says, I don't remember this happening. You put all of that together, that's a substantial preliminary showing. When the government says it's not material, I would pose the question, would any judge, having this application in front of him, he learns that this controlled call didn't actually happen? Would any judge sign that warrant? Of course not. Of course it's material to the defense. Well, if it didn't happen. If it didn't happen. And again, focusing on our burden here, the preliminary burden that we have at this stage of proceedings, just to get our foot in the door, to have answers. So these questions can be answered. We've got that burden here.  Thank you very much. Nicely argued, gentlemen. Nicely argued. Mr. Grissenden, the case is submitted. And because that is the last case on our calendar for today, we are adjourned.